DAVID J. VAN HAVERMAAT, Cal. Bar No. 175761
Email: vanhavermaatd@sec.gov
LUCEE S. KIRKA (Cal. Bar No. 121685)
Email: kirkal@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
John W. Berry, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.: 2:16-cv-07333 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| MARCUS A. LUNA, NORRELL L. WALKER, PAUL L. GOMEZ, and DUSTIN S. SMITH, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2. Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this Complaint.

3. Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district. In addition, venue is proper in this district because defendants Walker, Gomez and Smith reside in this district.

## SUMMARY

4. This matter involves a $13.6 million pump-and-dump scheme orchestrated by defendants Norrell Walker and Marcus Luna, with the help of their co-defendants. Walker has a criminal past, having pled guilty to conspiracy to commit mail fraud for a previous fraud. Luna, a California lawyer, is also a recidivist, having been a defendant in other SEC enforcement actions and found to have violated the federal securities laws.

5. Between February 2013 and February 2014, Walker's company, NL Walker & Associates ("NLW"), operated a boiler room that touted two microcap companies: Umax Group Corp. ("Umax") and Azure Holding Group Corp. ("Azure"). Walker and Luna owned and controlled both Umax and Azure.

6. Walker, with the assistance of defendants Paul Gomez and Dustin Smith, operated NLW as an unregistered broker-dealer that hired and trained telemarketers to cold-call potential investors to solicit their purchase of Umax's and Azure's securities. These NLW salespeople instructed investors to contact them before purchasing any shares, so that NLW could watch for the purchase to come on the market. And when investors placed an order in their own brokerage account, an NLW salesperson would be on the phone with them, instructing the investors as to

the number of shares to buy and the price at which to enter their order.

7. While Walker operated the sales room, unbeknownst to investors, Luna effectively acted as the counterparty to the investors' purchases, selling Umax and Azure stock he controlled through a number of offshore brokerages and financial institutions, reaping about $13.6 million in proceeds. Luna split the proceeds with Walker, transferring $7 million to Walker, who used the money to operate NLW, including paying undisclosed commissions to his sales staff.

8. By engaging in this conduct, the defendants have violated, and unless enjoined, will continue to violate, the antifraud provisions and registration requirements of the federal securities laws. Therefore, the SEC seeks permanent injunctions, disgorgement with prejudgment interest and civil penalties.

## THE DEFENDANTS

9. **Marcus A. Luna**, age 47, is formerly a resident of Henderson, Nevada. Luna controlled Windsong International, Ltd. ("Windsong"), an entity through which Luna owned shares of Umax and Azure. He is not registered with the SEC in any capacity. He is a licensed attorney in California, who was suspended on July 1, 2016 for failure to pay bar fees, but is eligible to be reinstated.

10. In *SEC v. Luna et al.*, No. 10-CV-02166 (D. Nev.) (filed Dec. 14, 2010), Luna was permanently enjoined from participating in a penny stock offering or providing legal services in connection with a Regulation D offering, and was ordered to pay $7 million in monetary relief. Luna has yet to pay any of that judgment.

11. Luna was also barred by the SEC from practicing or appearing before the SEC in *In the Matter of Marcus A. Luna, Esq.*, Admin. Proc. File No. 3-15886 (May 23, 2014).

12. **Norrell L. Walker**, age 57, is a resident of Signal Hill, California. Walker is the president and owner of NLW. He is not registered with the SEC in any capacity.

13. In 1998, in *U.S. v. Oakley et al.*, Case No. 1:98-cr-00503-JES-2

(S.D.N.Y. 1998), Walker pled guilty to conspiracy to commit mail fraud. He served 33 months in prison.

14. **Paul L. Gomez**, age 39, is a resident of Los Angeles, California. Gomez was the sales manager for NLW's Beverly Hills sales office. He is not registered with the SEC in any capacity.

15. **Dustin S. Smith**, age 35, is a resident of Ladera Ranch, California. Smith was the sales manager for NLW's Costa Mesa sales office. He is not registered with the SEC in any capacity.

## THE ALLEGATIONS

A. **Walker's and Luna's Scheme**

16. In early 2012, Walker and Luna set about implementing their penny stock manipulation scheme. Luna orchestrated the flow of stock, and Walker spearheaded the sales effort.

17. As part of their scheme, Walker and Luna relied on the services of Legacy Global Markets S.A. ("Legacy Global"), a Belizean brokerage, and Caledonian Bank Ltd. ("Caledonian Bank") and Caledonian Securities, Ltd. ("Caledonian Securities"), a bank and a brokerage firm, respectively, located in the Cayman Islands.

1. **Umax Group Corp.**

18. The pair took over Umax, a publicly-traded Nevada corporation located in Los Angeles and originally formed to distribute arcade games. Walker changed the purpose of Umax to focus, purportedly, on the sale of natural health supplements.

19. Umax's office space was located in the same space as one of Walker's boiler rooms.

20. Walker and Luna were equal partners in Umax.

21. Walker paid for Umax's office space, and installed a bookkeeper for his companies as the head of the company.

22. Luna helped the bookkeeper file the paperwork required to install her as

the sole officer and director of Umax, and advised her as to the corporate structure of the company.

23. Walker put his brother in charge of Umax's marketing, and eventually put another Walker associate in place as the CEO of the company.

24. Luna ultimately owned, through his company, Windsong, 11 million shares of Umax stock. The shares were held in a Windsong account at Legacy Global.

25. Luna gained control of these shares through a series of stock transfers among various foreign strawmen and entities.

26. NLW also owned 1.1 million shares of Umax.

**2.    Azure Holding Group Corp.**

27. Walker and Luna carried out their scheme with Azure in much the same way they had Umax.

28. Luna purchased Azure, a publicly-traded Nevada corporation located in Santa Monica, and purportedly made its purpose selling watermarking technology.

29. An associate of Walker was the CEO of Azure.

30. Luna ultimately owned, through his company, Windsong, 5.25 million shares of Azure stock. The shares were held in a Windsong account at Legacy Global.

31. Luna gained control of these shares through a series of stock transfers among various foreign strawmen and entities.

**B.    The Touting (the "Pump") of Umax and Azure Stock**

32. By October 2012, Walker had set up a boiler room in Los Angeles that operated under the NLW name.

33. He opened NLW offices in Beverly Hills and Costa Mesa, California and in Miami, Florida.

34. From January 2013 to February 2014, approximately 40 salespersons worked for NLW. The salespeople were hired, trained and supervised by Walker and

COMPLAINT                                           5

his top two lieutenants: defendants Gomez (who ran the Beverly Hills office) and Smith (who ran the Costa Mesa office).

35. Under the direction of Walker, Gomez and Smith, the NLW sales staff cold-called investors and solicited them to purchase shares of Umax or Azure through the investors' own brokerage accounts.

36. Undisclosed to investors, NLW paid its sales staff commissions ranging between 10% and 20% of the amount the investors invested in the stock. In total, NLW paid its salespersons almost $2.8 million in undisclosed commissions, with an additional undisclosed $1.6 million paid to persons suspected to be NLW salespersons.

37. A substantial portion of the commissions for selling Umax and Azure stock were paid to Gomez, who through his company GWT, LLC, received over $1.1 million, some of which was used to pay NLW salespersons.

38. Smith was paid over $237,000 in commissions for selling Umax and Azure stock.

39. Both Gomez and Smith gave NLW salespersons a pitch sheet to use when cold-calling investors. The pitch described NLW as a firm hired to promote the stock of a publicly-traded company. According to the pitch, the first phase of the solicitation consisted of calling investors to promote the stocks; the second phase involved promoting the stocks through email.

40. The main selling point in the cold-calls made by NLW salespersons was that NLW would be able to drive the price of the stock of Umax and Azure up to as much as $11 per share, and when it did so, the investor could cash out and make a substantial profit.

41. Gomez and Smith assured both investors and its salespeople about the legality of its operations, and that such stock promotion campaigns were routine.

42. According to investors, once an investor indicated a willingness to purchase stock, NLW salespeople followed a routine pattern. First, they instructed

the investor to contact them before purchasing any shares, so that NLW could watch for the sale to come on the market. NLW was able to do this through its use of a Bloomberg trading screen, which allowed them to see when the orders were placed.

43. Walker would then contact Luna, and let him know that a block of shares was coming in, and then Luna, or Walker if Luna was unavailable, would contact Caledonian Securities to fill the order with Luna's shares.

44. Thus, the investors solicited by the NLW sales staff purchased shares of Umax or Azure stock owned by Luna.

45. Sometimes, while investors placed an order in their own brokerage account, an NLW salesperson would be on the phone with them, instructing the investors as to the number of shares to buy and the price at which to enter their order. The NLW salesperson obtained this information from Walker, Smith, or Gomez.

46. NLW salespeople instructed investors to buy a specific number of shares at a specific price, sometimes at prices between five and fifteen cents above the then-market price in order to push the stock price higher.

47. NLW repeatedly contacted investors in an attempt to get them to purchase more shares in the companies they were promoting, and explicitly instructed investors not to sell their shares without first contacting NLW.

48. NLW also offered investors sales incentives to get them to invest. For example, with respect to Umax, NLW salespeople told investors that for every 25,000 shares that they purchased, the investor would receive 12,500 restricted shares for free, which would be convertible into free trading shares within six months. Another investor was awarded restricted shares when he complained about a drop in the price of Umax stock.

C. **The Misrepresentations and Omissions to Investors**

49. In the course of touting the Umax and Azure stock, Walker and Gomez, and the salespeople they trained, made numerous misrepresentations to investors, including the following.

50. NLW salespersons told investors that NLW did not pay commissions to its salespeople.

51. This was false because NLW paid commissions of 10% to 20% to its salesforce.

52. The NLW sales staff, including Walker, told several investors that Umax was going to be a leading nutraceutical company and at least one was told that Umax was very successful.

53. This was false, as the company had scant revenue or no real legitimate business prospects.

54. NLW salespersons, including Walker and Gomez, also told investors that there would be an email or marketing "campaign" to help promote the stocks.

55. This was not true because no such campaign ever occurred.

56. Walker himself told numerous lies about how and when NLW would make money from the rise in Umax and Azure stock. He told one investor that he would not make any money until Umax's stock price reached $11 per share. He told another investor that, while he had received some Umax shares, he was not allowed to sell them until the stock price had reached $4 per share. Still other investors were told by NLW salespersons that NLW would not make any money until the stock price reached $3 per share.

57. Each of these representations was false. Through the defendants' scheme, Walker was making money on each sale of Umax and Azure stock, and NLW salespersons were making money for every sale through commissions.

58. Each of these misrepresentations identified above and made by Walker, Gomez and the sales staff they oversaw were important to the decision of actual investors to purchase Umax and Azure stock.

59. Walker and Gomez also each knew, or were reckless in not knowing, that the misrepresentations set forth above were false.

**D.     The Defendants' Sale of Umax and Azure Shares (the "Dump")**

60.     NLW's efforts to inflate the price of Umax and Azure stock artificially proved successful, substantially increasing the stock price for both companies.

61.     Umax's stock price increased from $1.50 on its first day of trading on February 20, 2013 to a high of $2.98 per share on September 2, 2013.

62.     Similarly, Azure increased from a price of $1.15 on November 27, 2013, to a high of $1.95 per share on January 31, 2014.

63.     While NLW's salesforce, under Walker's control, encouraged investors to purchase shares of Umax and Azure, Luna sold millions of shares of these same stocks through the accounts his company, Windsong, held at Legacy Global.

64.     Luna sold his shares through several layers of foreign and domestic brokerage accounts in an attempt to mask his ownership of the stock.

65.     Luna split the proceeds of these stock sales with NLW.

66.     Between April 2013 and February 2014, Luna sold, through Windsong, approximately 7.3 million Umax shares for proceeds of approximately $10.8 million.

67.     NLW also sold some of its Umax shares. In July 2013, NLW sold 28,075 shares through its account at Aegis Securities Corp. for proceeds of $60,504.83.

68.     Between December 2013 and February 2014, Luna sold 2.06 million shares of Azure stock for proceeds of $2.8 million.

69.     In early 2014, NLW also received proceeds from the sale of Azure sales from a Texas corporation amounting to about $69,000.

70.     Eventually, NLW stopped touting, or pumping, the Umax and Azure stock. Both stock prices quickly plummeted when NLW ceased its touting activities.

71.     As of September 22, 2016, the Umax stock share price was quoted at $0.0001 per share, and the Azure stock share price was quoted at $0.012 per share.

72.     In total, the Umax and Azure stock sales netted Luna (through his company, Windsong) about $13.6 million. Luna directed the transfer of these sales

proceeds from Legacy Global to various individuals and entities.

73. Of the $13.6 million of proceeds, about $7 million were transferred to Walker.

74. Walker used at least $4.4 million of those proceeds to pay commissions to NLW salespeople.

75. Walker also appears to have kept a sizable amount of the proceeds for himself. Walker, the signatory on all of NLW's bank accounts, withdrew close to $800,000 in cash, including $19,800 in ATM transactions, and used a debit card linked to NLW's bank account to purchase at least $73,940 of luxury items.

76. Luna also transferred $3.4 million of the sale proceeds to a bank account in Colombia in the name of an individual believed to be Luna's girlfriend.

77. He transferred another $462,000 to another entity he controlled, $521,000 to another Windsong account, $66,350 to himself, and several other hundred thousand dollars to various individuals and entities.

78. One of the entities that Luna controlled funneled a portion of the stock sale proceeds back into Umax, helping him to fund Umax's skeletal operations.

E. **Lack of Registration by Defendants**

1. **No registration as brokers or dealers (Walker, Gomez, and Smith)**

79. In effecting the purchase of Umax and Azure stock by the investors, each of Walker, Gomez, and Smith acted as brokers.

80. Neither Walker, Gomez, nor Smith was an employee of either Umax or Azure.

81. Walker, Gomez, and Smith each actively and continuously solicited the purchase of Umax or Azure stock, and each received commissions or transaction-based remunerations.

82. In their conversations with investors, Walker, Gomez, and Smith made valuation projections for the stock, promising investors that they would be able to cash in when the stock price hit certain price thresholds.

COMPLAINT                                10

83. Also, the NLW boiler room operation existed for the sole purpose of cold-calling and soliciting new investors to maintain the artificial stock price levels Walker, Gomez, and Smith were able to establish through their fraudulent conduct.

84. NLW is not registered, and has never been registered, with the SEC as a broker or dealer.

85. Walker is not registered, and has never been registered, with the SEC as a broker or dealer.

86. Gomez is not registered, and has never been registered, with the SEC as a broker or dealer.

87. Smith is not registered, and has never been registered, with the SEC as a broker or dealer.

**2. No registration of the offer or sale of Umax and Azure stock**

88. Through his company, Windsong, Luna offered and/or sold shares of Umax and Azure stock to the public.

89. Through his firm, NLW, Walker offered and/or sold shares of Umax and Azure stock to the public.

90. As the lead salespeople for NLW, each of Gomez and Smith were necessary and substantial participants in the offer and sale of shares of Umax and Azure stock to the public.

91. The offer and sale of Umax stock by defendants are not registered, and have never been registered, with the SEC.

92. The offer and sale of Azure stock by the defendants are not registered, and have never been registered, with the SEC.

## FIRST CLAIM FOR RELIEF

**Violation of Section 17(a) of the Securities Act**

**(against Defendants Walker and Gomez)**

93. The SEC realleges and incorporates by reference paragraphs 1 through 92 above.

94. Defendants Walker and Gomez, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)    with scienter, employed devices, schemes, or artifices to defraud;

    (b)    obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    (c)    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

95. By engaging in the conduct described above, Defendants Walker and Gomez violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF

**Violation of Section 17(a)(1) and 17(a)(3) of the Securities Act**

**(against Defendant Luna)**

96. The SEC realleges and incorporates by reference paragraphs 1 through 92 above.

97. Defendant Luna, by engaging in the conduct described above, in the offer or sale of securities by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly:

    (a)    with scienter, employed devices, schemes, or artifices to defraud; or

    (b)    engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

98. By engaging in the conduct described above, Defendant Luna violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and

17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(1), (3)].

## THIRD CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendants Walker and Gomez)**

99. The SEC realleges and incorporates by reference paragraphs 1 through 92 above.

100. Defendants Walker and Gomez, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, with scienter:

    (a)    employed devices, schemes, or artifices to defraud;

    (b)    made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

    (c)    engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

101. By engaging in the conduct described above, Defendants Walker and Gomez violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a), (b) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (b), (c)].

## FOURTH CLAIM FOR RELIEF

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c)**

**(against Defendant Luna)**

102. The SEC realleges and incorporates by reference paragraphs 1 through 92 above.

103. Defendant Luna, by engaging in the conduct described above, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a

national securities exchange, with scienter:

      (a)     employed devices, schemes, or artifices to defraud; or

      (b)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

104. By engaging in the conduct described above, Defendant Luna violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5(a) and (c) thereunder [17 C.F.R. § 240.10b-5(a), (c)].

## FIFTH CLAIM FOR RELIEF

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (Against all Defendants)

105. The SEC realleges and incorporates by reference paragraphs 1 through 92 above.

106. Defendants, by engaging in the conduct described above, directly or indirectly, made use of means or instruments of transportation or communication in interstate commerce or of the mails, to offer to sell or to sell securities, or to carry or cause such securities to be carried through the mails or in interstate commerce for the purpose of sale or for delivery after sale.

107. No registration statement has been filed with the SEC or has been in effect with respect to any of the offerings alleged herein.

108. By engaging in the conduct described above, Defendants violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## SIXTH CLAIM FOR RELIEF

### Violations of Section 15(a) of the Exchange Act

### (Against Walker, Gomez, and Smith)

109. The SEC realleges and incorporates by reference paragraphs 1 through 92 above.

110. Defendants Walker, Gomez, and Smith, by engaging in the conduct described above, made use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security.

111. During the relevant time period, Defendants Walker, Gomez, and Smith were not registered as a broker or dealer.

112. By engaging in the conduct described above, Defendants Walker, Gomez, and Smith violated, and unless restrained and enjoined will continue to violate, Section 15(a)(1) of the Exchange Act [15 U.S.C. § 78o(a)(1)].

## **PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that the Court:

**I.**

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

**II.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Luna, Walker, and Gomez, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. §77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**III.**

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities

Act [15 U.S.C. §§ 77e(a), 77e(c)].

### IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Walker, Gomez, and Smith, and their agents, servants, employees, and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

### V.

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon.

### VI.

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

### VII.

Pursuant to Section 20(g) of the Securities Act, [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)], bar Defendants Walker, Gomez, and Smith from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

### VIII.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## IX.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: September 29, 2016

                                                */s/ David J. Van Havermaat*
                                                David J. Van Havermaat
                                                Lucee S. Kirka
                                                Attorney for Plaintiff
                                                Securities and Exchange Commission